648 So.2d 669 (1994)
Harry JONES, Appellant,
v.
STATE of Florida, Appellee.
No. 80827.
Supreme Court of Florida.
November 10, 1994.
Rehearing Denied January 25, 1995.
*671 James C. Banks, Sp. Asst. Public Defender, Tallahassee, for appellant.
*672 Robert A. Butterworth, Atty. Gen., and Gypsy Bailey, Asst. Atty. Gen., Tallahassee, for appellee.
KOGAN, Justice.
Harry Jones, a prisoner under sentence of death, appeals his convictions of first-degree murder, robbery, and grand theft of an motor vehicle and the attendant sentences. We have jurisdiction, pursuant to article V, section 3(b)(1) of the Florida Constitution, and affirm.
On July 18, 1991, Jones was charged with first-degree murder, robbery, and grand theft of a motor vehicle. Jones' first trial resulted in a hung jury and a mistrial. The following facts were revealed during his second trial. On June 1, 1991 sometime between 6:30 and 7:00 p.m., the victim in this case, George Wilson Young, Jr., went to a liquor store on the west side of Tallahassee. While Young was talking with his friend Archie Hamilton, who worked at the store, Harry Jones and Timothy Hollis came in. When Hollis, who was intoxicated, appeared to get sick, Jones took him to the rest room. According to Mr. Hamilton, Jones returned from the rest room to see Young pay for a half pint of gin from money Young pulled from his pocket. Young then helped Jones take Hollis outside, and agreed to give the two men a ride home. Several witnesses testified that they saw the three men leave the liquor store in Young's red Ford Bronco II a little before 7:00 p.m. Hollis's mother testified that Jones and a white-haired man brought her son home in a red truck and then left the house together. A clerk at a local convenience store testified that he saw Young and Jones together sometime between 7:30 and 8:00 p.m., when they purchased a six-pack of beer.
According to other testimony, at approximately 8:05 p.m., Young's truck was involved in an accident on the north side of town. Jones, the only occupant, was taken to the emergency room and admitted to the hospital.
When authorities realized that the owner of the truck Jones was driving was missing, a detective was sent to question Jones. Jones told the detective he borrowed the truck from a black man in "Frenchtown" for twenty dollars. The next day, when authorities learned that Jones had been seen with Young prior to the accident, two officers went to question Jones again. While in Jones' hospital room, the officers seized a bag of clothing that had been placed in the corner of Jones' room. The clothing had been removed from Jones by hospital personnel after the accident. The following day, law enforcement seized lottery tickets and cash that had been removed from Jones' pockets and placed in hospital security.
On June 6, 1991, Young's body was found in Boat Pond on Horseshoe Plantation in Northern Leon County, to the east of where the accident occurred. Witnesses who found the body testified that they previously had seen Jones fishing in other ponds on the plantation. Experts testified that soil and pollen samples taken from the shoes and pants that were seized from Jones' hospital room were similar to samples taken from Boat Pond. There also was testimony that the lottery tickets seized from hospital security had been purchased at the same place and time as tickets found in Young's truck.
According to the medical examiner, Young died as a result of fresh-water drowning. Although the medical examiner was unable to determine whether Young was conscious at the time he drowned, he was able to determine that Young was alive at the time he was submerged because of plant material that had become lodged in his lungs and throat. The medical examiner further testified that, among other injuries, Young suffered a fractured arm and several fractured ribs that were consistent with premortem defensive injuries.
Kevin Prim, who had been housed in the medical cell with Jones, testified that Jones told him that he met a "guy" at a liquor store. After observing the guy pull money from his pocket to pay for his purchase, Jones talked the guy into giving him and his intoxicated "cousin" a ride home. After dropping the cousin off, Jones and the guy went to a pond where a struggle ensued when Jones attempted to take the guy's money. Jones also admitted breaking the man's *673 arm during the struggle and then holding him down in the water until he stopped "popping up." Although Jones presented evidence in an attempt to discredit this testimony, another cellmate testified that he overheard Jones tell Prim that he had killed a man. Jones was found guilty as charged.
During the penalty phase, Jones took the stand. He testified that on May 31 he and Hollis drank most of the night and began drinking again the next morning. They continued to drink continuously throughout the day. Jones also testified that when he was taken to the hospital after the accident, his blood alcohol level was .269.
The jury recommended that Jones be sentenced to death by a vote of ten to two. The trial court followed the recommendation, finding three aggravating circumstances and three mitigating circumstances. In aggravation, the court found: 1) Jones was previously convicted of another violent felony;[1] 2) the murder was committed while Jones was engaged in the commission of a robbery; 3) the murder was especially heinous, atrocious, or cruel.[2] In mitigation, the court found: 1) Jones' capacity to appreciate the criminality of his conduct or to conform this conduct to the requirements of law was substantially impaired;[3] 2) Jones has suffered from a traumatic and difficult childhood; 3) Jones had the love and support of his family. Jones appeals both his convictions and death sentence.[4]

GUILT PHASE
First, we address Jones' contention that the trial court erred in denying his motion to suppress evidence that was seized from the hospital in violation of his rights under the Fourth Amendment to the United States Constitution and article I, section 12 of the Florida Constitution. According to testimony that was received during the suppression hearing, a detective from the Leon County Sheriff's Department questioned Jones the morning after the accident. At that time, Jones maintained that he had gotten the vehicle that was involved in the accident in Frenchtown and that he did not know anything about the missing man. Later that day, authorities became aware that Jones had been seen leaving a liquor store with Young the evening of the accident and that he had been seen leaving a residence with Young later that evening.
After learning that Jones had been seen with the missing man, Lieutenant Livings and Detective Wood, of the Leon County Sheriff's Department, went to the hospital approximately twenty-four hours after the accident to question Jones. The officers asked Jones if he knew the whereabouts of the owner of the vehicle. Jones responded with a head shake that he did not. When Lieutenant Livings confronted Jones with the fact that he had been seen with Young, Jones became uncooperative and refused to answer further questions. Prior to leaving Jones' room, the officers seized a bag of clothing.
According to Lieutenant Livings' testimony at the suppression hearing, prior to entering Jones' room, the officers had "determined from hospital personnel" that the clothing Jones was wearing at the time of the accident had been removed and put in a bag that had been placed in Jones' hospital room. Lieutenant Livings further testified that based on everything that his department had *674 uncovered, "suspicion was very high that there may have been foul play involved in this situation." According to the lieutenant, he also was concerned that Mr. Young had been in the vehicle at the time of the accident and may have been "out in the woods somewhere injured." Lieutenant Livings decided that the clothing should be seized because, from his experience, he believed that evidence taken from Jones' clothing might assist in the search for the missing man. The lieutenant further testified that having dealt with hospitals in the past, he was concerned that the clothing "could very well" disappear due to a deliberate act of the defendant or inadvertent act of hospital personnel. According to Lieutenant Livings, on the way out of Jones' room, he looked into an unsealed bag in the corner of the room. After confirming that it contained the clothing, Lieutenant Livings instructed Detective Woods to seize the bag.
Lieutenant Livings further testified that not long after the clothing was seized, an officer was posted outside Jones' room. The next day, authorities checked with hospital personnel and discovered that some cash and lottery tickets had been removed from Jones' pockets and were being held by hospital security. Authorities were aware that Jones did not have much money in his possession at the time he left the liquor store with Young and that Young had been seen with a rather large sum of money prior to leaving the store. They also were aware that lottery tickets had been recovered from Young's truck. Because he was concerned that the money and tickets might be released to Jones' family, Lieutenant Livings also had these items seized prior to obtaining a warrant.
On cross-examination, Lieutenant Livings testified that it generally took between three and six hours to obtain a search warrant in an emergency situation. He also testified that a guard could have been posted outside Jones' room to observe the clothing until a warrant was obtained.
After hearing the testimony and argument, the trial court denied Jones' motion to suppress the evidence. The court concluded that although Jones' "might have had some slight reasonable expectation of privacy [in his hospital room], it was not with the strength it would be in his private home." The court went on to explain that it looked upon "the situation more or less as the officer taking [the items seized] into protective custody."
Both the Fourth Amendment to the United States Constitution and article I, section 12 of the Florida Constitution, protect the people of this state from "unreasonable searches and seizures" of "their persons, houses, papers and effects." The protection afforded by our state constitution is expressly limited to that afforded under the Fourth Amendment as interpreted by the United States Supreme Court. See Bernie v. State, 524 So.2d 988 (Fla. 1988); art. I, § 12, Fla. Const. (Article I, section 12 "right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court."). Thus, in addressing this claim, we must rely on decisions of the United States Supreme Court. However, because the Supreme Court has not addressed the precise situation presented here, we also are free to look to other jurisdictions that have addressed similar claims.
As a general rule, a warrantless search or seizure is per se unreasonable, unless the search or seizure falls within one of the well established exceptions to the warrant requirement. Minnesota v. Dickerson, ___ U.S. ___, ___, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993); United States v. Place, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983); Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971); Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). It is undisputed that no warrants were obtained for the seizures at issue here. The State also concedes that there is no "protective custody" exception to the warrant requirement but asks us to uphold the trial court's ruling based on various other theories.
First, the State argues that Jones did not have "standing" to contest the seizures because he did not have a legitimate expectation *675 of privacy in the places from which the items were seized or in the items themselves. See Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In Dean v. State, 478 So.2d 38 (Fla. 1985), this Court adopted the "single-treatment analysis" set forth by the United States Supreme Court in Rakas for determining whether a defendant is entitled to bring a Fourth Amendment challenge to a search or seizure. Under this analysis, a defendant has "standing" to challenge a search or seizure if the defendant's Fourth Amendment rights were infringed by the challenged search or seizure. State v. Suco, 521 So.2d 1100, 1102 (Fla. 1988); Dean, 478 So.2d at 40-41; see also United States v. Padilla, ___ U.S. ___, ___, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993); United States v. Salvucci, 448 U.S. 83, 87 n. 4, 100 S.Ct. 2547, 2551 n. 4, 65 L.Ed.2d 619 (1980).
The United States Supreme Court has explained that the Fourth Amendment, made applicable to the States by the Fourteenth Amendment to the United States Constitution,
protects two types of expectations, one involving "searches," the other "seizures." A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.
United States v. Jacobsen, 466 U.S. 109, 112, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). Thus, in order to challenge a search, a defendant must demonstrate that he or she had a reasonable expectation of privacy in the premises or property searched. Suco, 521 So.2d at 1102; Rawlings v. Kentucky, 448 U.S. 98, 104-05, 100 S.Ct. 2556, 2561-62, 65 L.Ed.2d 633 (1980). However, to challenge a seizure, the defendant only need establish that the seizure interfered with his or her constitutionally protected possessory interests. The infringement of privacy rights, while often a precursor to a seizure of property, is not necessary to such challenge. Padilla, ___ U.S. at ___, 113 S.Ct. at 1939; Soldal v. Cook County, ___ U.S. ___, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992).
In this case, even if we were to find that Jones' privacy interests were in no way compromised, there clearly was a meaningful interference with his constitutionally protected possessory rights when his effects were seized without a warrant. Accord People v. Hayes, 154 Misc.2d 429, 584 N.Y.S.2d 1001 (N.Y. Sup. Ct. 1992) (defendant's property rights were violated when his belongings were removed from hospital without a warrant). Jones never gave up his possessory rights in his belongings prior to their seizure. Moreover, Jones' clothing was returned to his immediate possession and control when it was placed in his room.
We agree with other jurisdictions that have addressed the issue. Because Jones never voluntarily abandoned either his clothing or other effects, he had no reason to believe that his belongings would be turned over to police without his authorization. Even though hospital staff generally has joint access to and control of personal effects kept in a patient's room, the staff cannot consent to the search or seizure of the effects because it has no right to mutual use of a patient's belongings, as required by United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Accord Commonwealth v. Silo, 480 Pa. 15, 389 A.2d 62 (1978) (hospital staff cannot consent to search or seizure of patient's effects because staff does not have right to mutual use of effects; staff's access and control are for sole purpose of safeguarding effects), cert. denied, 439 U.S. 1132, 99 S.Ct. 1053, 59 L.Ed.2d 94 (1979); Morris v. Commonwealth, 208 Va. 331, 157 S.E.2d 191 (1967) (hospital personnel had no authority to consent to seizure of patient's effects from hospital room). Likewise, hospital security, acting as bailee of a patient's belongings, has no authority to release the belongings without the patient's authorization. Accord Hayes, 584 N.Y.S.2d at 1004 (as bailee of patient's clothing, hospital had no authority to release clothing to police without owner's consent); People v. Jordan, 187 Mich. App. 582, 468 N.W.2d 294, 300 (1991) (same); People v. Watt, 118 Misc.2d 930, 462 N.Y.S.2d 389, 391 (N.Y. Sup. Ct. 1983) (same).
*676 As noted above, warrantless seizures of personal property are generally considered unreasonable for Fourth Amendment purposes unless there is probable cause to believe the property is or contains contraband or evidence of a crime and the seizure falls within an established exception to the warrant requirement. Place, 462 U.S. at 701, 103 S.Ct. at 2641. In this regard, the State argues that Jones' clothing, money and lottery tickets were properly seized due to "exigent circumstances" or because they were in "open view" or "plain view." The State correctly points out that in reviewing a trial court's ruling on a motion to suppress, we interpret the evidence and reasonable inferences and deductions drawn therefrom in a manner most favorable to sustaining the trial court's ruling. Johnson v. State, 438 So.2d 774, 776 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984). However, none of the State's theories are supported by the evidence presented at the suppression hearing in this case.
First, we address the State's claim that the warrantless seizure was justified by exigent circumstances. According to Lieutenant Livings' testimony, having dealt with the hospital in the past, he felt the clothing could disappear either by deliberate act of the defendant or by inadvertent act of hospital personnel. However, Livings also testified that an officer could have been posted to safeguard the clothing until a warrant could be obtained and that a guard was in fact posted outside Jones' room a short time after the seizure. Accord Segura v. United States, 468 U.S. 796, 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984) (securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while search warrant is being sought is not unreasonable seizure of dwelling or its contents). Likewise, as to the items being held by hospital security, the State offered no explanation as to why a guard was not posted to ensure that Jones' belongings were not removed or why security was not asked to hold the belongings for the three to six hours it would have taken to obtain a warrant. Even if there had been probable cause to support the seizure of Jones' clothing and other effects, the circumstances revealed at the suppression hearing were not sufficiently "exigent" to supplant the requirement that the State obtain a warrant prior to such seizure. Accord United States v. Jeffers, 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951) (no exigent circumstances supporting warrantless seizure of contraband from hotel room where officers admit they easily could have prevented destruction or removal of seized property by merely guarding the door); Hayes, 584 N.Y.S.2d at 1004 (no exigent circumstances where police could have requested hospital attendant not to remove patient's clothing from place it was being held until a warrant was obtained); Watt, 462 N.Y.S.2d at 392 (no exigent circumstances where one detective could have been posted to safeguard patient's clothing while other went to obtain warrant).
Next, we address the State's "open view" and "plain view" arguments. As this Court explained in Ensor v. State, 403 So.2d 349 (Fla. 1981), both of these distinct concepts involve a situation where a police officer observes contraband or evidence of a crime. However, the analysis to be employed in determining whether the warrantless seizure of the property is justified depends primarily on where the observation occurred. Under what this Court has referred to as the "open view" doctrine, objects such as weapons or contraband found in a "public place" can be seized without a warrant. 403 So.2d at 352. As we explained, this situation occurs when both the officer and the contraband are in an area where the defendant has no reasonable expectation of privacy. Id. Because privacy rights are not implicated, the seizure of property in open view is presumptively reasonable, assuming there is "probable cause to associate the property with criminal activity." Payton v. New York, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); see also Texas v. Brown, 460 U.S. 730, 741-42, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion); Soldal, ___ U.S. at ___, 113 S.Ct. at 547.
The State's open view argument fails for two reasons. First, we agree with the trial court that Jones did not have the *677 heightened expectation of privacy in his hospital room that he would have had in his home. However, we cannot agree that a defendant's hospital room is a "public place" for Fourth Amendment purposes. While Jones could expect that hospital personnel would enter his room to perform routine hospital procedures, and that members of the public would be allowed to visit him in his room if he did not object, Jones' had no reason to believe that third parties would enter his room to look for and seize his personal property. Accord People v. Brown, 88 Cal. App.3d 283, 151 Cal. Rptr. 749 (1979) (although by checking into hospital patient may waive right of privacy as to hospital personnel, patient has not turned "his" room into a public thoroughfare). Under the circumstances present here, this is an expectation we believe society is prepared to recognize as reasonable. Minnesota v. Olson, 495 U.S. 91, 95-96, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) (expectation of privacy is reasonable for Fourth Amendment purposes if defendant has subjective expectation of privacy and that expectation is one that society is prepared to recognize as "reasonable"); accord Morris, 157 S.E.2d at 194 (under facts of that case, hospital patient had reasonable expectation of privacy in his room similar to that of hotel guest); but cf. United States v. George, 987 F.2d 1428, 1432 (9th Cir.1993) (defendant admitted to hospital under police supervision, after arrest and after x-ray revealed that he likely had balloons containing contraband in his stomach, did not have a reasonable expectation of privacy in hospital room or bedpan). Moreover, even if Jones' hospital room were considered a public place, as explained below we do not believe that at the time of the seizure the officers had probable cause to associate the bag of clothing with criminal activity. Payton.
The plain view doctrine, likewise, cannot support the warrantless seizure of Jones' clothing. As we explained in Ensor, that doctrine generally comes into play when both the police officer, as the result of a "prior valid intrusion," and the contraband or evidence of a crime are in an area where the defendant has a reasonable expectation of privacy. 403 So.2d at 352. Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object [itself], they may seize it, without a warrant."[5]Minnesota v. Dickerson, ___ U.S. ___, ___-___, 113 S.Ct. 2130, 2136-37, 124 L.Ed.2d 334 (1993); see also Horton v. California, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 2307-08, 110 L.Ed.2d 112 (1990).
Jones does not challenge the legality of the officers' presence in his room at the time they viewed the bag of clothing. However, even if the first condition for a plain view seizure was satisfied and the officers were lawfully in a position to view the bag, neither of the other two conditions were met here.
First, the officers had no lawful right of access to the bag of clothing. Whether police had a lawful right of access to the object of a plain view seizure is generally determined by the scope of the search permitted by either the terms of a validly issued warrant or the character of the relevant exception to the warrant requirement. Horton, 496 U.S. at 140-42, 110 S.Ct. at 2310; see also Texas v. Brown, 460 U.S. at 738-39, 103 S.Ct. at 1541 ("plain view" should not be considered an independent exception to the warrant requirement, but rather an extension of a prior justification for an officer's "access to an object") (plurality opinion). The lawful access requirement is a "corollary" of the principle that "no amount of probable cause can justify a warrantless search or seizure absent `exigent circumstances.'" Horton, 496 U.S. at 137 n. 7, 110 S.Ct. at 2308 n. 7 (quoting Coolidge, 403 U.S. at 468, 91 S.Ct. at 2039). This requirement serves several of the purposes sought to be furthered by the inadvertency requirement urged by the plurality in Coolidge. See Horton, 496 U.S. at 137-42, 110 S.Ct. at 2308-10. For example, in a case such as this, it ensures that the stated purpose for entry into *678 the place where the object is viewed is not a pretext to justify a warrantless seizure of the object. It also ensures that the scope of the intrusion into Fourth Amendment rights is no greater than that already authorized in connection with the lawful entry.
It appears from testimony given at the suppression hearing that although the bag containing Jones' clothing was unsealed, its contents were not apparent until Lieutenant Livings actually walked over to the bag, which was in the corner of the room, and looked into it. There is no question that at the time of the seizure, the officers were not acting pursuant to either a validly issued warrant or a recognized exception to the warrant requirement that would have given them access to the bag itself. The officers were lawfully in Jones' room to question him, not to look for evidence that could have been in the bag. While Jones may have "consented" to the officers' presence in his room for the purpose of questioning him, he never consented to their inspection or seizure of the bag in the corner of his room.
Secondly, the incriminating character of the clothing was not "immediately apparent." Even after Lieutenant Livings determined that the bag contained clothing, the probative value of the clothing did not become apparent until it was examined by an expert and the "mud" was detected on Jones' shoes and pants. See Horton, 496 U.S. at 137-38, 110 S.Ct. at 2308 (incriminating character of evidence seized in plain view must be apparent without recourse to later examination or testing). This "immediately apparent" requirement is another way of saying that at the time police view the object to be seized, they must have probable cause to believe that the object is contraband or evidence of a crime. See Dickerson, ___ U.S. at ___, 113 S.Ct. at 2137 (incriminating character of object of plain view seizure is not immediately apparent if police lack probable cause to believe the object is contraband or evidence of a crime without conducting some further search of the object); Soldal, ___ U.S. at ___, 113 S.Ct. at 547 (warrantless seizure of effects in plain view is reasonable only if item's incriminating character is immediately apparent, in other words there is probable cause to associate the property with criminal activity).
In this case, it does not appear the "mud" that was later removed from the clothing was visible when Lieutenant Livings first looked into the bag. Moreover, at the time of the seizure, Lieutenant Livings only suspected that a crime had occurred and any link between Jones' clothing and the suspected crime was in no way "apparent." Under the circumstances, Livings may have had a "suspicion" that the clothing was evidence of a crime. However, he did not have probable cause for such a belief until sometime after the seizure, when the victim's body was discovered in the pond and the clothing was examined by a soil specialist. Lieutenant Livings' suspicion clearly was insufficient to justify the type of seizure that occurred here. See Arizona v. Hicks, 480 U.S. 321, 326-27, 107 S.Ct. 1149, 1153-54, 94 L.Ed.2d 347 (1987) (probable cause is generally necessary to justify a seizure of effects unless the seizure is minimally intrusive and operational necessities render it the only practicable means of detecting certain types of crimes).
Because the items seized from hospital security were not in open or plain view prior to the seizure, the State likewise cannot justify that seizure under either of those doctrines. Nor can the seizure be upheld because hospital security appears to have consented to it. As noted above, the hospital was holding Jones' effects as bailee of his property. As such, hospital personnel had no authority to release Jones' money or lottery tickets to third-parties, absent either authorization from Jones or a valid warrant for the seizure of the items. See Hayes, 584 N.Y.S.2d at 1004; Jordan, 468 N.W.2d at 300; Watt, 462 N.Y.S.2d at 391.
Although we agree with Jones that the illegally seized evidence and testimony relating thereto should have been suppressed, we find the admission of this evidence harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). At the time of the accident, Jones was the only occupant in George Young's truck. Jones had been seen with Young a relatively short time before the accident. The accident occurred on the north side of town not far *679 from where Young's body was later found. Jones admitted to a cellmate that he took a man he met in a liquor store to a pond where the two struggled when Jones tried to take the man's money. He also admitted pushing the man's head under water until he stopped struggling. On this record, there is no reasonable possibility that the outcome of Jones' trial would have been different had the illegally seized evidence been suppressed. Id.
Next, we turn to Jones' claim that it was error to admit, over objection, several photographs that depict the victim's body as it was discovered in and recovered from Boat Pond. He also challenges the trial court's ruling on several photographs that were taken during the autopsy of the victim. He argues that because there was no dispute regarding the victim's death, "there was no justifiable relevancy for the admissibility of the pictures." And thus, there was no need to introduce photographs that only served to inflame and prejudice the jury.
We rejected a similar claim in Nixon v. State, 572 So.2d 1336 (Fla. 1990), cert. denied, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). There we explained relevant photographs are properly admitted unless their relevance is outweighed by their prejudicial effect. 572 So.2d at 1342; see also Burns v. State, 609 So.2d 600, 604 (Fla. 1992). In this case, one of the challenged photos (5E) was excluded. The others were relevant either to show the condition and location of the body when discovered, or to assist the medical examiner in explaining the condition of the victim's clothing or the nature of his injuries and the cause of death. We cannot say that the trial court abused its discretion in admitting these photographs, because individually or in combination their shocking nature did not outweigh their probative valve.
Although Jones has not challenged the sufficiency of the evidence, there clearly is competent, substantial evidence to support his convictions.

PENALTY PHASE
In connection with the penalty phase of his trial, Jones claims that the automatic application of the "during the course of a felony" aggravator, section 921.141(5)(b), fails to adequately narrow the class of felony murders eligible for the death penalty. This claim was not raised below and, therefore, has not been preserved for our review. Swafford v. State, 533 So.2d 270, 278 (Fla. 1988), cert. denied, 489 U.S. 1100, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989). Moreover, we previously have rejected similar challenges to this aggravating factor. See, e.g., Stewart v. State, 588 So.2d 972, 973 (Fla. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1599, 118 L.Ed.2d 313 (1992); Engle v. Dugger, 576 So.2d 696, 704 (Fla. 1991); Squires v. State, 450 So.2d 208, 212 (Fla.), cert. denied, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984).
Jones' challenge to the heinous, atrocious, or cruel aggravating factor and to the new jury instruction on that factor also have been rejected by this Court. Hall v. State, 614 So.2d 473 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993); Preston v. State, 607 So.2d 404 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993). Jones' challenge to the application of this aggravator likewise is without merit. Although the medical examiner could not say whether Young was conscious at the time he was drowned, he could say that the victim was conscious during the initial struggle with Jones, when his arm and ribs were fractured. According to the medical examiner, Young's broken arm and ribs were consistent with premortem defensive wounds. This evidence along with Jones' account of the incident as recounted by his cellmate  Jones pushed Young's head into the water until it stopped popping up  supports the trial court's finding that George Young, Jr., experienced a great deal of pain and terror as he attempted to fend off his killer prior to being drowned.
We also reject Jones' claim that the trial court erred in failing to adequately consider competent, uncontroverted mitigating evidence, contrary to this Court's decisions in Nibert v. State, 574 So.2d 1059 (Fla. 1990), and Campbell v. State, 571 So.2d 415 (Fla. 1990). Jones specifically contends that the court failed to adequately consider uncontroverted *680 evidence that he was intoxicated at the time of the murder and that the court all but rejected evidence of Jones' traumatic childhood when it noted that, because of the remoteness in time and the fact that Jones' similarly situated sisters have become productive citizens, this factor is not entitled to great weight.
First, it is clear from the sentencing order that the trial court considered Jones' intoxication in finding that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. This was consistent with defense counsel's reliance on the evidence of intoxication in arguing that the mental mitigating factor should be found.
The trial judge also found Jones' traumatic and difficult childhood to be a mitigating factor but determined that it, like the mental mitigator found, was not entitled to great weight. The trial court properly found and considered in mitigation Jones' intoxication at the time of the murder and his unfortunate childhood. While these mitigating factors were entitled to some weight, the weight to be given was within the trial court's discretion. See Ellis v. State, 622 So.2d 991, 1001 (Fla. 1993); Swafford, 533 So.2d at 278. We find no abuse of discretion here.
Finally, although Jones has not raised the issue, we have compared this case to other death penalty cases and find that death is proportionally warranted. Accordingly, having found no reversible error, we affirm the convictions and sentences.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW and HARDING, JJ., concur.
NOTES
[1] Jones previously was convicted of attempted robbery, robbery, two counts of robbery with a firearm, and robbery with a firearm and kidnapping.
[2] §§ 921.141(5)(b), (d), (h), Fla. Stat. (1991), respectively.
[3] § 921.141(6)(f), Fla. Stat. (1991).
[4] Jones raises the following claims in this appeal: 1) the trial court erred in failing to suppress evidence obtained in violation of Jones' rights under the Fourth Amendment to the United States Constitution and article I, section 12 of the Florida Constitution; 2) it was error to admit gruesome photographs of the victim; 3) the felony murder aggravating circumstance fails to "genuinely narrow" the class of murderers eligible for the death penalty; 4) the heinous, atrocious, or cruel aggravator is unconstitutional under the United States Supreme Court's decision in Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992); 5) the trial court erred in finding the murder was heinous, atrocious, or cruel; and 6) the trial court erred in failing to adequately consider uncontroverted evidence of two mitigating circumstances.
[5] Inadvertent discovery of the incriminating evidence is no longer considered an essential element of a valid plain view seizure. Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).